## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TONY REAVES,** | : | **NO.: 1:09-CV-2549** |
| **Plaintiff** | : | |
| | : | **JUDGE CONNER** |
| **v.** | : | |
| | : | **MAGISTRATE JUDGE METHVIN** |
| **PENNSYLVANIA STATE POLICE,** | : | |
| **Defendant** | : | |
| | : | |

### REPORT AND RECOMMENDATION ON THE DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT
### (Doc. 19)

This is a Title VII action for discrimination and retaliation filed by Tony
Reaves against the Pennsylvania State Police ("the PSP"). Before the court is the
PSP's motion for summary judgment which has been referred to the undersigned
magistrate judge for report and recommendation (Docs. 19, 38).

## FINDINGS AND RECOMMENDATIONS

## I. Procedural Background

Reaves, an African American, was terminated as a Trooper on October 4
2007, during his probationary term with the PSP. Reaves filed a complaint with
the Pennsylvania Human Relations Commission and the EEOC on October 12,
2007, alleging discrimination and retaliation. In early October 2009, the EEOC
issued a right-to-sue letter, and on December 28, 2009, Reaves filed his original
complaint in this court against the PSP and three of its officers. (Doc. 1).

2

Defendants filed a partial motion to dismiss, and Reaves filed an amended complaint on March 25, 2010 (Doc. 11) which names only the PSP as defendant. The PSP filed its answer on April 15, 2010 (Doc. 13), and filed the instant motion for summary judgment, statement of facts, and supporting exhibits, on February 28, 2011. (Docs. 19–21.) The PSP filed a brief in support of their motion on March 21, 2011 (Doc. 26).  Reaves filed an opposing brief and counter-statement of facts with supporting exhibits on April 25, 2011. (Docs. 29 and 30.) The PSP filed a reply brief on May 16, 2011. (Doc. 35.) All further filing deadlines have passed.

### *Issues Presented*

The PSP seeks dismissal of Reaves' claims on the following grounds:

1.    Reaves' Title VII racial discrimination claim fails because he has not established a *prima facie* case; the PSP has established legitimate reasons for Reaves' dismissal; and Reaves cannot meet his burden to prove pretext.

2.    Reaves' Title VII retaliation claim fails because:

   a.    his complaints to the PSP failed to specifically allege race as the motivation for his disparate treatment, and therefore the complaints were not "protected conduct" under Title VII; and

   b.    even if Reaves' complaints were protected conduct under Title VII, he cannot show a causal link between such conduct and any adverse employment actions.

3

## II. Factual Background

The factual background is viewed in the light most favorable to Reaves, as non-movant.

Reaves is an African-American. (Docs. 20, 29 ¶ 1). He entered the Pennsylvania State Police Academy as one of two African American cadets in October, 2005 and graduated as a Trooper in April, 2006. (*Id*. at ¶ 3). Reaves was then employed by the PSP as a full-time Trooper on probationary status at the Avondale barracks. The purpose of the probationary trooper program is to allow an opportunity for supervisors to have a more comprehensive and in-depth evaluation of probationary troopers. (*Id*. at ¶ 6; AR 5-2). Probationary Troopers can only be dismissed "for proper cause." (Doc. 29, ¶ 6, Doc. 29-6, at 4, ¶ 3.03B.)

During the course of his probationary period, Reaves earned the top score of "satisfactory" in most categories, progressively improving with each job evaluation. In his first evaluation, for the period July 22 to September 17, 2006, Reaves was ranked satisfactory in nine of fifteen categories, and "borderline - needs improvement" in six. (Docs. 20, 29 at ¶ 27.) Reaves was counseled and made the necessary changes in his conduct according to his second evaluation in November, 2006. (Exhibit N, Doc. 21-11). In the latter evaluation, he was ranked as satisfactory in twelve of fifteen categories. (*Id*.) In his third evaluation in

January, 2007, Reaves earned satisfactory marks in all but one category—job knowledge. (Docs. 20, 29 at ¶ 43). A March, 2007 evaluation rated Reaves as satisfactory in all categories. (*Id*. at ¶ 68). A May, 2007 evaluation also rated Reaves as satisfactory in all categories. (*Id*. at ¶ 71).

During his probationary status, several issues were raised to Reaves' superiors regarding his conduct. On October 11, 2006, a citizen contacted Cpl. Magee to report improper conduct of Reaves during the course of an investigation. (*Id*. at ¶ 34). An internal investigation conducted into this complaint was adjudicated as "not sustained," indicating that the allegations were not proven. (*Id*. at ¶ 38).

On January 23, 2007, Cpl. Ranck prepared a progress report reviewing Reaves' probationary period as a state trooper. (Doc. 21-9, Ex. X). The stated purpose of the report was "to ensure that Reaves [was] meeting the standards for continues employment with the PSP." (*Id*.) Drawing from interviews with all supervisors at the Avondale barracks as well as members of the public who had dealings with Reaves as a member of the PSP, Cpl. Ranck concluded that Reaves met the standards of the PSP. (*Id*.) Moreover, Cpl. Ranck noted that Reaves was "an asset to the Department and should continue to be a productive member of the State Police." (*Id*.) Cpl. Ranck further recommended retention of Reaves upon the completion of his probationary period. (*Id*.)

5

In March, 2007, the Probationary Trooper Review Panel recommended that Reaves' probation be extended over retention. (*Id*. at ¶ 60). This recommendation was adopted by the Probationary Trooper Administrative Review Panel (*Id*. at ¶ 61). Thereafter, on July 21, 2007, Reaves was pulled over in his personal vehicle for passing a state police car on the right. (*Id*. at ¶ 76).[1] The incident was brought to the attention of Reaves' station commander. (*Id*. at ¶ 77). An investigation was commenced when a complaint sheet was sent to Internal Affairs by Lt. Sneed. (*Id*. at ¶ 78–79). Internal Affairs, however, declined to investigate the matter. (*Id*. at ¶ 79). Further, at the suggestion of another trooper, Cpl. Ranck talked to Sgt. Kissinger regarding an incident he had with Reaves. Cpl. Ranck learned from Sgt. Kissinger, an 18-year department veteran, that he had a disagreement with the Reaves as to whether an individual could be arrested for leaving notes on a car requesting the owners not park in front on his property. (*Id*. at ¶ 89). Sgt. Kissinger, who was investigating the matter, declined to find that an arrest was

---

[1] Reaves was not cited for this matter. It is not a violation of the department's rules and regulations to be pulled-over while off-duty if no citation is issued. (Plaintiff's Counterstatement of Facts, Doc. 29, ¶ 88).

6

warranted, but Reaves, who was not involved in the investigation, insisted that an

arrest happen. (*Id*.)[2]

Cpl. Ranck prepared a supplemental General Investigation ("GI") report in

review of Reaves' probationary trooper status. (*Id*. at ¶ 86). The report noted both

the July 21, 2007 traffic stop as well as the incident with Sgt. Kissinger. (*Id*. at

¶ 87). Additionally, the report included information from Cpl. King that Reaves

had an increase in errors and omissions in his reporting. (*Id*. at ¶ 91). The

supplemental GI further noted the following incidents involving Reaves:

- an incident in Lake Como police department regarding an incident occurring on April 26, 2006 where Reaves was named a suspect in the theft of a motorcycle ramp, but no charge or conviction resulted (*Id*. at ¶ 97);

- a stop made by PSP Media, in which Reaves was stopped for approaching a state police car and then passing it on the right, and then weaving and speeding up the road (*Id*. at ¶ 99);

- a call by New Jersey State Police informing Ranck that Reaves had been pulled over for speeding on March 12, 2007 (*Id*. at ¶ 101).

Defendant contends that these incidents of poor behavior were factors in

Reaves' termination. (*See* Doc. 20). Reaves argues, however, that the incidents are

unsupported and go beyond the scope of his performance as a state trooper, thus

---

[2] Sgt. Kissinger is now deceased and did not give a sworn statement as to the incident he reported to Cpl. Ranck. (Doc. 29, ¶ 89).

evidencing a pattern of antagonism towards him by the PSP. (*See* Plaintiff's

Counterstatement of Facts, Doc. 29).

Although the majority of his supervisors recommended retention, Cpl. Ranck

concluded the supplemental GI with his recommendation that Reaves not be

retained. (Docs. 20, 29 at ¶ 93, 94). Upon Cpl. Ranck's recommendation, Capt.

Laufer made the decision to terminate plaintiff. (*Id*. at ¶ 103, 104). On

September 18, 2007, the Probationary Trooper Review Panel met to review

plaintiff's probation extension. (*Id*. at ¶ 107). The Panel concluded that plaintiff

did not have the proper demeanor to be a state trooper. (*Id*.). The Probationary

Trooper Administrative Review Panel agreed with the determination to dismiss

plaintiff. (*Id*. at ¶ 108). The decision states that plaintiff's performance and

behavior do not meet the standard of the PSP. (Doc. 29, ¶ 109).

On October 4, 2007, plaintiff was given a dismissal letter which included as its

reasons for terminating him the PSP's position that plaintiff disregarded state law,

that he engaged in unprofessional conduct and that he placed the PSP in jeopardy

of damage to its image and potential civil liability. (*Id*. at ¶ 110). Additionally, an

evaluation of plaintiff conducted the day before rated plaintiff less favorably that

prior evaluations. (*Id*. at ¶ 111). The evaluation included an unsatisfactory grade in

his general attitude/behavior, noting that plaintiff had complained of a double

standard in play. (Doc. 29, ¶ 111). The report indicates that Reaves declined to cite specific examples of what he viewed as disparate treatment. (*Id*.).

In fact, Reaves had earlier spoken to Cpl. Ranck in July, 2007 about his belief that he was being treated differently than others. (*Id*. at ¶ 112). Reaves felt that the differential treatment was because of his race. (*Id*.).  Additionally, Reaves contacted the PSP Equal Employment Opportunity office on numerous occasions from the time his probationary period was extended in March, 2007 until his dismissal in October, 2007. (*Id*. at ¶ 116). However, no return calls were made to him, nor was Reaves given any form to fill out, nor any inquiry number given to his complaint, nor was Reaves interviewed. (*Id*.).

Lt. Sneed testified that Reaves also felt he was treated differently when several members of the station went to the firing range and he was left behind. (*Id*. at ¶ 122). Reaves sent a complaint to Lt. Sneed in which he outlined his issues and concerns with what he perceived as different treatment than other troopers received. (*Id*. at ¶ 125, 126). Reaves' complaint made specific reference to him being told to "go pick cotton," which, he maintains, is a statement indicative of racial discrimination. (Doc. 29, ¶ 127).[3]

---

[3] This specific comment was made by a member of the public, not anyone within the PSP. (Doc. 21-1, p.119). In fact, Reaves testified that there were no racial comments made to him by anyone in the PSP. (*Id*. at  p. 111).

Although the decision-maker on his termination, Capt. Laufer, asserted that he was not aware of Reaves' complaints of disparate treatment, Laufer had spoken to Lt. Henry about Reaves' communications with the EEO office. (Docs. 22, 29, ¶ 128). The parties also cite to a number of alleged comparators to demonstrate, or refute, the alleged disparate treatment of Reaves based on his race. (*Id.* at ¶¶ 142–155).[4]

During his employment with the PSP, Reaves did not file a claim with the EEOC or the PHRA. (*Id.* at ¶ 161). As noted above, however, he did contact the PSP EEO office on 11 occasions regarding his alleged unfair treatment. (Doc. 29, ¶ 161). An EEOC complaint filed after his termination identified the basis of his discrimination as, inter alia, race. (*Id.* at ¶ 162). Additionally, Reaves filed an internal affairs complaint with the PSP on May 1, 2008, regarding the lack of investigation into his complaints of discrimination. (*Id.* at ¶ 164).

The present action followed.

## III. Standard of review

In considering a motion for summary judgment in a Title VII case, where, as here, the plaintiff's Title VII case relies upon indirect evidence, the Third Circuit

---

[4] To the extent the comparators are relevant to the present matter, they are discussed in the legal analysis below.

applies the three-step burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must show a prima facie case; then the defendant offers a legitimate, nondiscriminatory reason for the adverse action taken; finally, the plaintiff presents that proffered reason as mere pretext. *Id*. at 802, 804.

The prima facie case requires a plaintiff to establish (1) membership in a protected class; (2) qualification for the position; (3) having suffered an adverse employment action; and (4) that the employer took the adverse employment action under circumstances raising an inference of discriminatory action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (*citing McDonnell Douglas*, 411 U.S. at 802); id. *(citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). A discriminatory inference can often be shown by evidence that "nonmembers of the protected class were treated more favorably." *Goosby v. Johnson & Johnson Med., Inc*., 228 F.3d 313, 318–19 (3d Cir. 2000). The prima facie burden of production is "not onerous," meant to be flexible and tailored to each case. *Tex. Dep't of Cmty. A airs v. Burdine*, 450 U.S. 248, 253 & n.6 (1981) (*quoting McDonnell Douglas*, 411 U.S. at 802). If the plaintiff makes the requisite showing, the court presumes that the adverse employment action was "more likely than not based on the consideration of impermissible factors." *Pivirotto v. Innovative Sys.,*

*Inc.*, 191 F.3d 344, 352 *(citing Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)).

The burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Sarullo*, 352 F.3d at 798 *(citing McDonnell Douglas*, 411 U.S. at 802). The defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 799 *(quoting St. Mary's Honor Ctr.*, 509 U.S. at 507) (internal quotation marks omitted). So doing rebuts the presumption of discrimination. *Id.* at 797 *(citing Burdine*, 450 U.S. at 255). The plaintiff must then produce evidence sufficient to allow a reasonable factfinder to conclude that the employer's proffered reasons were pretext for illegal discrimination or retaliation. *Id.* at 799. The plaintiff may meet this burden, and defeat a motion for summary judgment, with evidence "that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" *Sarullo*, 352 F.3d at 799–800 *(quoting Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999)).

The plaintiff may make this showing in either of two ways. One the defendant's proffered reasons may be shown to be "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Id.* at 800 *(quoting Keller v. Orix Credit Alliance, Inc.*, 2130 F.3d 1101, 1108–09 (3d Cir. 1997)); *accord Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Two, the plaintiff may provide "evidence that 'the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Id.* (*quoting Jones*, 198 F.3d at 413).

> Determining the existence of discriminatory intent, where the record reflects conflicting evidence, is within the province of the fact finder. *See Lepore*, 816 F.Supp. at 1017 (*citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) and *Washington v. Davis*, 426 U.S. 229, 242 (1976)). However, on a motion for summary judgment, if the non-moving party does not provide sufficient evidence to support each element of the prima facie case, the case does not withstand summary judgment and the fact finder need never address the factual question of intent. *See Serbin*, 96 F.3d at 69 n. 2 (*quoting Celotex*, 477 U.S. at 322). The converse, of course, also holds true. That is, where the non-moving party provides sufficient evidence to preclude summary judgment, the fact finder assumes the duty of evaluating, *inter alia*, the evidence of discriminatory intent.

*U. S. v. Branella, 972 F.Supp. 294, 299 (D.N.J.1997).*

The general standard of review for summary-judgment motions applies as well: under Federal Rule of Civil Procedure 56(a), a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. *P.* 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact

is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## IV. Discussion

### (A) Title VII discrimination because of race

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

No one disputes that Reaves is black, was qualified for his job, or suffered adverse employment actions, first the probation extension and then the termination of his employment. However, the parties disagree on the fourth and final element of the prima-facie case: whether there are PSP employees situated similarly enough to Reaves that their different treatment would give rise to an inference of discrimination.

In addressing the fourth element, the PSP extensively briefs the alleged differences between Reaves and his twelve purported similarly-situated coworkers.[5] In response, Reaves attaches fifty-four exhibits supporting eighty

---

[5] Among the paragraphs of its statement of facts that the PSP cites in support of its argument about comparators are ¶¶ 25–32, 34–39, 46–53, 57, 58, 67, 78, 84, 87–101, 104–110, 135, and 142. These paragraphs, in turn, each cited one time or many the following eighteen exhibits or portions of them: Def.'s Exhs. A, C, D, G, J, K, L, M, N, X, Y, Z, KK, LL, MM, NN, OO, and PP, which (ignoring cover sheets) total around 275 pages. Sheer volume alone hardly proves a point, but in this instance, it does evince a certain vehemence.

pages of counter-statements of material facts. It is clear from a review of the exhibits and SMF's submitted by both parties that there are genuine disputes of material fact as to the comparators.

For example, Reaves offers Trooper Chris Winesburg as a comparator. Winesburg, who is white, was retained after probation, despite the fact that he was allegedly stopped for a traffic violation by the East Fallowfield Township Police Department, and also by the PSP on the Turnpike.[6] Reaves alleges that Winesburg was never disciplined.[7] In testimony, Reaves acknowledged that Winesburg may never have reported these incidents to his supervisor and that he and Reaves had different supervisors.[8] The PSP further contends that at the time its officers recommended Reaves' dismissal, they were unaware of any other probationary troopers with multiple traffic stops or "attitude, conduct, and deportment issues" like those Reaves had allegedly demonstrated.[9] Similar factual disputes about the

---

[6] Am. Compl. ¶ 85, Doc. 11; Reaves Dep. 79:13–82:17, Nov. 18. 2010, Def.'s Exh. A, Doc. 21-1, at 20–21.

[7] *Ids.*

[8] Reaves Dep. 80:16–81:22, Def.'s Exh. A, Doc. 21-1, at 21–22.

[9] Def.'s Stmt. of Undisputed Material Facts ¶¶ 156–60, Doc. 20 [hereinafter Statement of Facts].

comparability of all those that Reaves claims were similarly situated prevent

summary judgment.[10]

Appellate and trial courts around the country define "similarly situated" with

varying degrees of stringency.[11] This district is among the courts requiring the

_____

[10] For another example of what Reaves puts forth as differential treatment, consider Trooper Vicky Spencer, who, while on probation, "received sticky notes on her reports" instead of report correction notices. (Brief in Support at 26.) Reaves testified that receiving merely sticky notes, rather than report-correction notices, is significant because "they're not logged" or "tracked." (Reaves Dep. 93:5–9, Doc. 21-1, Def.'s Exh. A, Doc. 21-1 at 25.) He did, however, acknowledge that although he sometimes got report-correction notices (which were logged and tracked), he sometimes got sticky notes himself; he also had no knowledge about the number of correction notices that Spencer received, and did not claim that this ostensible "differential treatment was because she was white and [he was] black." (*Id.* at 93:10–94:4, Def.'s Exh. A, Doc. 21-1, at 25.)

[11] On the lenient end of the spectrum is the test that the Supreme Court enunciated in 1976, which imposes no requirement to "plead with 'particularity' the degree of similarity" between the plaintiff and a comparator. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976). "[P]recise equivalence in culpability between employees is not the ultimate question"; rather, "[c]omparable seriousness" is sufficient. *Id.* Likewise and more recently, in the First Circuit, the test is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . . Exact correlation is neither likely nor necessary," but the cases must be fair congeners." *Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 38 (1st Cir. 1998) (omission in original) (quoting *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir. 1997)). Likewise, the Seventh Circuit recently defined a similarly situated coworker as "substantially similar," not a "clone." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008))

Another case that provides a relatively loose interpretation, yet ultimately somewhat more demanding than the previous cases, of "similarly situated" is *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000). The plaintiff, Graham, a black LIRR employee, was hired in 1975 and, although "not a model employee," received a promotion some years later *Id.* at 37. Graham was later fired after failing a drug test. Graham sued under Title VII for racial discrimination; the district could upheld the termination because Graham

18

greatest degree of parity between a plaintiff and proffered comparators: they are similarly situated if they "have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such

---

could not show that the employees he felt were better treated were, in fact, similarly situated. *Id.*

The Second Circuit's reversal of the disparate-treatment issue turned on its conclusion that the district court applied an "unduly inflexible" standard of what it means to be similarly situated. *Id.* at 43; *see also id.* at 42–43 (discussing the facts and explaining why the district court's application was "unduly inflexible").

Under *Graham*, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* at 39 (collecting cases). A plaintiff seeking to raise an inference of discrimination must show that purported comparators were "similarly situated in all material respects." *Id.* at 39 (citing *Shumway v. United Parcel Serv.*, 118 F.3d 60 (2d Cir. 1997)). Finally, coemployees used as comparators must have been "subject to the same performance evaluation and discipline standards," and a plaintiff must "show that similarly situated employees who went undisciplined engaged in comparable conduct." *Id.* at 40 (citing *Shumway*, 118 F.3d at 64). Nonetheless, "comparable" conduct does not mean "identical," *id.* (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 804 (1973); it just means that if the "reprehensibility" of the conduct of the plaintiff and the similarly situated comparator were quantifiable, the numbers would be close to equal.

Then there are those cases that more strictly define "similarly situated." In the Eastern District of Pennsylvania, comparators are similarly situated when they "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 489–90 (E.D. Pa. 1999) (quoting *Dill v. Runyon*, No. 96-3584, 1997 WL 164275, at *4 (E.D. Pa. Apr. 3, 2007), and *Children's Hosp. of Phila.*, No. 97-1510, 1997 WL 793518, at 2 (E.D. Pa. Dec. 3, 2007)). The *Bullock* court remarked that a plaintiff in a racial-discrimination case may establish circumstances suggesting discrimination through other kinds of evidence than that dealing with similarly situated employees, but — in a case, like this one, before the Court on a summary-judgment motion — "the plaintiff must prove by a preponderance of the evidence that a prima facie case of discrimination exists. It does not suffice to suggest the mere possibility of discrimination." *Id.* at 490. *See also id.* at 489–90 (explaining why Nurses's Aides were not situated similarly to Registered Nurses, making them useless as comparators in a discrimination case).

differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it." *Walters v. Potter,* No. 05-1745, 2007 WL

693978, at *6 (M.D. Pa. Mar. 5, 2007) (Conner, J.) (quoting *Ogden v. Keystone*

*Residence*, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002), and *Red v. Potter*, No. 05-

5256, 2006 WL 3349563, at *2 (3d Cir. 2006) ("[I]n order to show that an

employee is 'similarly situated', all of the relevant aspects of employment need to

be nearly identical.")).[12] Nonetheless, it must be kept in mind — as Reaves points

out[13] — that "an overly narrow application of the similarly situated standard"

frustrates Title VII's antidiscrimination purpose. *Jackson v. FedEx Corp. Servs.,*

*Inc.*, 518 F.3d 388 (6th Cir. 2008).

   Here, the facts concerning the fourth element of plaintiff's Title VII racial

discrimination case are highly contested. The standards for evaluating them are

complex. The state of the record is not such that either party is entitled to

judgment as a matter of law on this point.

---

[12] In *Walters*, the Court found that the thirteen comparators trained in Harrisburg, where the plaintiff was also trained, were similarly situated; for four other comparators, "sufficient 'differentiating or mitigating circumstances'" existed to distinguish their treatment: they conducted their on-site training in different locations, were evaluated by supervisors different from plaintiff's, and were trained in customer service (whereas the plaintiff was trained in distribution operations). *Walters*, 2007 WL 693978, at *6 n.16.

[13] Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. 3–4, Doc. 30, at 7–8 [hereinafter Brief in Opposition].

20

Furthermore, many genuine disputes of material fact are presented by the parties as to the other aspects of the *McDonnell-Douglas* test. Reaves has submitted sufficient evidence of contradictions and inconsistences in the PSP's version of events that could lead a fact-finder to conclude that the PSP's cited reasons for extending Reaves' probation and later dismissing him were indeed pretextual. Several examples follow.

Lt. Sneed's SP-101 complaint took issue with Reaves' driving a vehicle registered out of state.[14] Sneed acknowledged in his deposition, however, that Reaves "wasn't doing anything wrong" by driving that vehicle.[15] Further, the SP-101 form states that "various members" of the PSP brought forth information about Reaves' being pulled over for a traffic stop on July 21, 2007, whereas the PSP admitted in its answer to the complaint in this case that Reaves himself informed his supervisor, Cpl. Ranck, of the traffic stop.[16]

The PSP claims that Ranck was unaware of Reaves' "off-duty issues" until after Reaves' fourth and fifth PTEs were completed and signed; however, the

---

[14] Use of Force or Complaint Reception and Processing Work Sheet, Form SP 1-101, by Lt. Shelton Sneed against Tpr. Tony Reaves (July 24, 2007), Pl.'s Exh. 30, at 3, Doc. 29-30, at 3.

[15] Sneed. Dep. 47:23–48:1, Jan. 14, 2011, Pl.'s Exh. 49, Doc. 29-49, at 14.

[16] Counterstatement of Facts ¶ 78 & n.6 (citing Am. Compl. ¶ 78, Doc. 11; Answer ¶ 78, Doc. 13).

record shows that Ranck knew of several such issues before these PTEs were completed, yet he had no explanation for why he waited until months later to mention these issues in his Supplemental GI reports.[17]

In light of the genuine disputes of material fact regarding Reaves' Title VII racial-discrimination claim, it is recommended that the Court deny the PSP's motion for summary judgment on this claim.

### (B) Retaliation for conduct protected under Title VII

Establishing a prima facie case of retaliation under Title VII requires a plaintiff to adduce evidence that (1) he engaged in activity protected by Title VII, (2) the employer took adverse action against him, and (3) there was a causal connection between the plaintiff's engagement in protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 41 F.3d 383, 386 (3d Cir. 1995); *accord Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). If the plaintiff makes this prima facie showing, the same *McDonnell Douglas* burden-shift approach applies. *Moore*, 461 at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494,

---

[17] *Id.* ¶ 102 (citing Ranck Supervisory File 3, Pl.'s Exh. 12, Doc. 29-12, at 3 (noting on August 13, 2006, that Reaves had been pulled over by PSP Media), and Ranck Dep. 141:24–142:14, Nov. 19, 2010, Pl.'s Exh. 47, Doc. 29-47, at 38 (admitting that he had no explanation for failing to mention in his January 2007 GI report that Reaves was pulled over by PSP Embreeville in May 2006 despite already having the information in his file)).

500–01 (3d Cir. 1997)) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.

1994)).

There are two kinds of protected activity that Title VII's anti-retaliation

provision recognizes: (1) participation "in certain Title VII proceedings (the

'participation clause')" and (2) opposition to "discrimination made unlawful by

Title VII (the 'opposition clause')." *Id.* at 341 (quoting *Slagle v. County of

Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). *Moore* makes clear that both clauses

impose an exacting standard on a plaintiff making a Title VII retaliation claim:

"Whether the employee opposes, or participates in a proceeding against, the

employer's activity, the employee must hold an objectively reasonable belief, in

good faith, that the activity they oppose is unlawful under Title VII. Moreover, the

employee's 'opposition' to unlawful discrimination must not be equivocal." *Id.*

(internal citations omitted) (citing *Clark County v. Breeden*, 532 U.S. 268, 271

(2001) (per curiam), *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d

Cir. 1996), and *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir.

1995)).

At his deposition on October 18, 2010, Reaves testified that when he

complained in July and August 2007 of being treated differently to Corporal

Ranck, Lieutenant Henry of the PSP EEO office, and Lieutenant Sneed, he

believed he was being treated differently because of his race; he believed he was complaining of discrimination; he believed the PSP EEO office was in charge of doing investigations for "protected class," a phrase he knew the meaning of; and that he did, in fact, tell Lt. Sneed, both verbally and in writing, that he felt like he was being discriminated against.[18] In his deposition, Reaves indicated that the word "race" may not have been explicitly included in any complaint to PSP personnel. However,  a lack of precise language is not fatal to Reaves' retaliation claim.

Indeed, a five-page letter Reaves gave to Lt. Sneed[19] states that he felt he was "treated differently than other members of the station" and lists a number of examples of such treatment. The letter to Lt. Sneed, while not specifically articulating that the discrimination was racially-motivated, includes a comment that he was told to "go pick cotton,"[20] which could be read to suggest discrimination based on race.

---

[18] Reaves Dep. 193:4–21, Oct. 18, 2010, Def.'s Exh. A, Doc. 21-1, at 50 (when telling Cpl. Ranck that he was being treated differently, he believed the basis for the different treatment was race); *id.* 194:20–195:2 ("Q. Did you believe you were complaining of discrimination? — A. Yes, ma'am."); *id.* 199:2–25, Doc. 21-1, at 51 (testifying about the role of the PSP EEO office, his knowledge of the phrase "protected class," and that he complained to Sneed of discrimination verbally and in writing).

[19] Doc. 29-13.

[20] *Id.* at 3.

24

More significant to this issue is the testimony of Lt. Henry, who directed the PSP EEO office. One of Lt. Henry's first questions to Reaves in their brief initial conversation was to ask plaintiff if he is a minority, and Reaves identified himself as black. (Doc. 29, Ex. 51., p. 39–40). As noted above, this initial phone conversation was made because Reaves felt he was subject to different treatment than his co-workers. Indeed, one would wonder why, given the brevity of this first conversation, Henry would raise the question of whether Reaves is a minority or a member of a protected class if there is not an inference or suggestion that such a classification forms the basis of his alleged differential treatment. Thus, regardless of Reaves failure to explicitly state the nature of his discriminatory treatment to be racial, Henry's testimony could suggest that he believed, and/or that he felt that Reaves believed, that the discrimination was based on race.

Additionally, as noted above, Reaves contacted the EEO office eleven times. However, Lt. Henry conceded that no formal tracking number was assigned to the matter, no investigation into the matter was conducted nor was there any notification to the Bureau of Professional Responsibility. The testimony of Lt. Henry stating that there was no complaint made by Reaves on which his office could have acted is contradicted by the PSP's position statement in response to the EEOC, to which Reaves had made a charge of discrimination, stating that Lt.

Henry conducted and completed an investigation into Reaves' alleged discriminatory treatment. (Doc.29-10, ¶ 4).

Reaves' own testimony, coupled with Lt. Henry's statement acknowledging that plaintiff informed him he is black as well as the letter to Lt. Sneed identifying a racial comment made to plaintiff, suggest Reaves believed the differential treatment was due to his race and, further, that such a conclusion is easily and readily inferred by others. A defendant should not escape liability by refusing to draw an apparent conclusion under the guise of a plaintiff's failure to use the "magic words." Therefore, in contacting the EEO office to discuss the discrimination he perceived, plaintiff engaged in any conduct cognizable by Title VII's anti-retaliation provisions.

A reasonable jury could conclude that the EEO office and PSP clearly understood the basis of Reaves' complaints. Thus, whether the PSP and its EEO office knew that Reaves was complaining of disparate treatment based upon *race* is a genuine dispute of material fact. Accordingly, there is no genuine dispute of material fact regarding Reaves' retaliation claim, and summary judgment for the PSP is not appropriate.

26

## VI. Conclusion

Based on the foregoing, it is recommended that this Court DENY defendant's motion for summary judgment as to plaintiff's racial-discrimination claim, and DENY it as to plaintiff's retaliation claim.

Signed March 8, 2012.

_____

MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE